*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 17-CF-1347

EUGENE BURNS, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF1-17629-15)

(Hon. Hiram E. Puig-Lugo, Trial Judge)
(Hon. Curtis E. von Kann, Warrant Judge)

(Argued December 10, 2019                    Decided August 20, 2020)

*Matthew B. Kaplan* for appellant.

*Eric Hansford*, Assistant United States Attorney, with whom *Jessie K. Liu*, United States Attorney, and *Elizabeth Trosman*, *Elizabeth H. Danello*, *Kevin Flynn*, and *Charles Willoughby, Jr.*, Assistant United States Attorneys, were on the brief, for appellee.

*Fleming Terrell*, Public Defender Service, with whom *Samia Fam*, *Alice Wang*, and *Joshua Deahl*, Public Defender Service, were on the brief, for Public Defender Service, *amicus curiae*, in support of appellant.

Before FISHER and EASTERLY, *Associate Judges*, and KRAVITZ, *Associate Judge, Superior Court of the District of Columbia.*[*]

---

[*] Sitting by designation pursuant to D.C. Code § 11-707(a) (2012 Repl.).

KRAVITZ, *Associate Judge*: We issued a summary order of judgment on March 30, 2020 reversing appellant Eugene Burns's convictions in this case. We now issue this formal opinion stating the full reasoning underlying our decision.

A Superior Court jury found Mr. Burns guilty of first-degree premeditated murder while armed and related weapons offenses in the November 14, 2015 shooting death of Onyekachi Osuchukwu. The government's theory at trial was that Mr. Burns killed Mr. Osuchukwu, his best friend, because he thought Mr. Osuchukwu was cheating him out of his fair share of the proceeds of a drug dealing business the two men operated together. Mr. Burns argued that he acted in self-defense, testifying that he shot Mr. Osuchukwu at close range only after Mr. Osuchukwu rushed him and tried to wrestle away his gun in an argument over the money.

The government prevailed at trial largely on the strength of data obtained from two cell phones seized from Mr. Burns on the day after the shooting and the testimony of the Chief Medical Examiner about the results of an autopsy performed by one of his deputies. Police obtained the cell phone data pursuant to Superior Court search warrants that authorized a review of the entire contents of Mr. Burns's phones; the data included highly incriminating records of internet

search inquiries made by Mr. Burns in the days leading up to the homicide ("Are you capable of killing your best friend?" "How does it feel when you kill someone for the first time?" "Shot placement for instant kill?") and enabled the government to paint a compelling picture of Mr. Burns's premeditation and deliberation. The Chief Medical Examiner's testimony contradicted Mr. Burns's claims about the way the shooting unfolded with detailed information about the gunshot wounds described in the autopsy report, including the absence of soot and stippling the government argued would have been observed at the site of the wounds had the shots been fired from within inches of Mr. Osuchukwu's body.

On appeal, Mr. Burns contends that the trial judge committed reversible error in denying his pretrial motions to suppress the data obtained from his cell phones and to exclude the Chief Medical Examiner's testimony about the results of the autopsy. Mr. Burns argues that the search warrants were overbroad, lacking in particularity, and almost entirely unsupported by probable cause and were thus issued in violation of the Warrant Clause of the Fourth Amendment. He argues that the testimony of the Chief Medical Examiner conveyed testimonial hearsay statements of the deputy medical examiner who performed the autopsy and was thus presented to the jury in violation of the Confrontation Clause of the Sixth Amendment.

Both constitutional claims implicate important and recurring aspects of the criminal process in the District of Columbia. Virtually everyone in the District now uses a cell phone — typically a modern smart phone capable of holding an extraordinary amount of personal information related to the user and/or owner of the device. Given the trove of information stored on many cell phones and the Supreme Court's ruling in *Riley v. California*, 573 U.S. 373 (2014), that police generally must obtain a search warrant before they may examine the contents of a cell phone, search warrant requests seeking access to cell phone data have become a common feature of law enforcement investigations in the District, with warrant applications presented to the Superior Court by police in large numbers. At the same time, turnover and other personnel challenges in the Office of the Chief Medical Examiner have, with some frequency, led the government in homicide trials to offer testimony relating to the cause and manner of death from forensic pathologists who neither conducted nor attended the autopsies on which their testimony is based.

Yet despite the ubiquity of cell phones and cell phone search warrants, this is the first case in which this court has been called on to analyze the validity of a cell phone search warrant under the Warrant Clause. And although several of our

previous decisions have addressed Confrontation Clause challenges to surrogate medical examiner testimony under the plain error standard, *see, e.g.*, *Sheffield v. United States*, 111 A.3d 611, 623 (D.C. 2015); *Euceda v. United States*, 66 A.3d 994, 1012 (D.C. 2013), this is the first case in which we have been required to consider the constitutionality of such testimony on the merits and, in particular, to determine whether autopsy records created and maintained within the Office of the Chief Medical Examiner contain "testimonial" hearsay statements subject to the Confrontation Clause under *Crawford v. Washington*, 541 U.S. 36 (2004), and its progeny. *See Sheffield*, 111 A.3d at 623 ("[N]either this court nor the Supreme Court has decided whether autopsy reports are testimonial[.]").

We conclude that Mr. Burns has established violations of his rights under both the Fourth and the Sixth Amendments. Police sought search warrants that authorized an unlimited review of the contents of his cell phones for "any evidence" of murder even though the warrants were supported by affidavits that established probable cause for only three narrow and discrete items of data. The warrants were thus overbroad and lacking in probable cause and particularity, and the warrant judge should not have issued them. The warrants' deficiencies, moreover, were so extreme and apparent that a reasonably well-trained police officer, with reasonable knowledge of what the law prohibits, would have known

the warrants were invalid notwithstanding their approval by a judge. The good faith exception to the exclusionary rule therefore does not apply, and the trial judge should have granted Mr. Burns's motion to suppress all of the data collected from both phones. Separately, the Chief Medical Examiner's testimony plainly transmitted to the jury the findings of the deputy medical examiner who conducted the autopsy on Mr. Osuchukwu's remains. Because those findings, set forth in the autopsy report and other materials maintained in the autopsy file, were made in the context of an ongoing police investigation of a homicide, the findings were "testimonial" and their communication to the jury through the Chief Medical Examiner's testimony violated the Confrontation Clause. Both constitutional errors prejudiced Mr. Burns at trial, and in combination they cannot be deemed harmless beyond a reasonable doubt.[1]

---

[1] Because we resolve this appeal on Fourth and Sixth Amendment grounds, we need not address Mr. Burns's Fifth Amendment claim that his cell phones (and their data) should have been suppressed as fruits of an involuntary statement he made to police or his challenge to a post-trial ruling denying his claim of ineffective assistance of counsel.

## I.    The Cell Phone Search Warrants

### A. <u>The Warrants and Their Supporting Affidavits</u>

Metropolitan Police Department Detective Lee Littlejohn applied to the Superior Court on November 25, 2015 for search warrants for two cell phones seized from Mr. Burns on the day after the shooting.  One of the cell phones was an LG, the other an Alcatel One Touch.  The search warrants and their supporting affidavits were identical in scope and substance, differing only in the identification of the phone to be searched pursuant to each.  The warrant for the LG, along with its supporting affidavit, is reproduced in full in the appendix to this opinion.

Under the heading "PROBABLE CAUSE," Detective Littlejohn stated in the warrant affidavits that police went to 2958 Second Street, S.E., Apt. 23 on Sunday, November 15, 2015 in response to a report of an unconscious person.  On arrival, police found Mr. Osuchukwu dead on the living room floor, the apparent victim of a shooting.  Also present in the apartment were Mr. Burns's mother, Mr. Burns, and a cousin — identified in the affidavits, respectively, as W-1, W-2, and W-3.

As relayed in the affidavits, Mr. Burns's mother (W-1) told police that she lived in Apt. 23 but had left home on Friday, November 13, 2015 to spend the weekend with family. She stated that Mr. Burns and Mr. Osuchukwu were best friends and that Mr. Osuchukwu had arrived in the District of Columbia from California at some point on Saturday, November 14, 2015. She said she returned to her apartment on November 15, 2015 with Mr. Burns and his cousin and found Mr. Osuchukwu on the floor, unconscious and unresponsive, as soon as they opened the door. She called 911.

The affidavits next summarized a police interview of Mr. Burns (W-2):

> Homicide Detectives on the scene spoke briefly to Witness #2, hereafter referred to as W-2. W-2 stated that family members collectively gathered money and purchased the decedent an airline ticket to Washington, D.C. W-2 stated IT exchanged text messages with the decedent throughout the day. W-2 stayed at the apartment waiting for the decedent's arrival. According to W-2, the last communications via text with decedent was around 7:30 p.m. W-2 decided to leave the apartment to meet with friends and left the apartment door unlocked so that the decedent could gain access to the apartment. W-2 didn't return to the apartment until the following day. Detectives attempted to ask W-2 additional questions, but W-2 refused to provide any additional information. W-2 was found to be in possession of two cellular telephones at the time, which were seized pending the issuance of a D.C. Superior Court search warrant to have them processed.

The affidavits also recounted an interview of Mr. Burns's cousin (W-3), who told police he spoke with Mr. Burns by phone on the night of November 14, 2015. The cousin stated that Mr. Burns told him he had been expecting Mr. Osuchukwu to arrive at the apartment but had gone out and left the door unlocked when Mr. Osuchukwu did not show up. The cousin stated further that he and Mr. Burns met up later on the night of November 14, 2015 at a woman's house in Southeast D.C. When asked to check his cell phone for the specific time of his call with Mr. Burns on the night of November 14, 2015, the cousin appeared to have difficulty providing the information.

Further investigation, summarized in the affidavits, showed that an occupant of another apartment in the building called 911 at 8:53 on the night of November 14, 2015 to report the sound of gunshots. In the call, the neighbor said she heard six gunshots followed by a woman's voice and a person running out of the building. The neighbor said she ran to her window and looked outside but saw no one.

The affidavits also stated that police obtained and executed an emergency search warrant for Apt. 23 on the night of November 15, 2015. The search of the apartment led to the discovery of a plastic bag containing mail matter with Mr.

Osuchukwu's name on it and the cord of a cell phone charger. Mr. Osuchukwu's wallet and cell phone were not found, however, even though another witness, referred to in the affidavits as W-4, told police that Mr. Osuchukwu always had his cell phone and wallet with him when he traveled.

Finally, the affidavits reported that an autopsy performed on November 16, 2015 found the cause of death to be multiple gunshot wounds to the torso and the manner of death to be a homicide.

Based exclusively on the foregoing information set forth in the affidavits, Detective Littlejohn asserted that there was probable cause to believe the phones seized from Mr. Burns contained evidence related to Mr. Osuchukwu's murder:

> It is your Affiant's belief that there is probable cause that evidence related to this homicide may be contained in the ["LG"] ["Alcatel One Touch"] cellular telephone device. It is also your Affiant's belief that obtaining the phone information requested is the least intrusive means of establishing namely, but not limited to, who possessed or used the device, the subscriber and owner information, the cell phone device phone number, incoming and outgoing calls, contact list, all existing voice mail and text messages, and videos, photographs and tweets contained within the described cellular telephone. Furthermore, it[] is your Affiant's belief that this information could establish the whereabouts of W-2 [Mr. Burns] and W-3 [Mr. Burns's cousin] cellular telephones on the night and time of the murder and help identify

potential witnesses, suspects and confederates yet unknown.

Each of the requested search warrants had two attachments. Attachment A specified the cell phone to be searched and stated that the warrant "authorize[d] the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B." Attachment B listed the categories of data to be seized from each of the phones:

1. All records on the Device described in Attachment A that relate to violations of D.C. Code, Section 22-2201 [the first-degree murder statute], including:

   a. any evidence related to the aforementioned homicide that occurred on or about November 15, 2015;

   b. any identifying information of the owner/possessor, and or owner/possessor's friends[,] acquaintances, and/or relatives;

   c. any information recording the owner/possessor's schedule or travel or location from October 1 to November 16, 2015;

2. Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, texts, tweets, phonebooks, saved usernames and passwords, documents, and browsing history;

3. Records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user

entered into any Internet search engine, and records of user-typed web addresses.

Attachment B also specified that the terms "records" and "information" were to be broadly construed:

> As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

A Superior Court judge (the warrant judge) approved the requested warrants, without modification, on November 25, 2015.

## B. **The Execution of the Warrants**

An investigator with the United States Attorney's Office executed the search warrants a few days later using a software program called Cellebrite to extract all of the data on both phones, including data the user of the phones likely believed had been deleted. For each phone, the extraction process created a ".bin file" containing an image in computer code of the phone's entire contents. A Cellebrite physical analyzer then decoded and parsed the image into categories of data — *e.g.*, call logs, emails, photographs, videos, movies, SMS and MMS messages,

thumbnails, app usage, internet search inquiries, etc. — and generated an extraction report that detailed, in readable and reviewable form, every item of data on the phone. The extraction report for the LG phone was 1,174 pages long; for the Alcatel One Touch, the report spanned 1,805 pages.

The extraction report for the LG phone contained a series of text messages between Mr. Burns and Mr. Osuchukwu on the evening of November 14, 2015. The texts culminated in a message sent at 9:02 p.m. in which Mr. Burns told Mr. Osuchukwu, "I left the door open for you all, so it's yours tonight."

The warrants, however, did not limit police to a search for the texts between Mr. Burns and Mr. Osuchukwu on the day of the shooting, and investigators scrutinized all of the nearly 3,000 pages of the extraction reports for any materials and information related to the investigation of Mr. Osuchukwu's death. Among other things, that review yielded a highly incriminating set of internet search inquiries made by Mr. Burns in the days leading up to the homicide:

- "Are you capable of killing your best friend?" (November 5, 2015)

- "What does it feel like to kill someone?" (November 7, 2015)

- "What does it feel like to murder someone?" (November 7, 2015)

- "How does it feel when you kill someone for the first time?" (November 7, 2015)

- "How much crack would an ounce of cocaine make?" (November 9, 2015)

- "How to sell weed and make money" (November 10, 2015)

- "Will God forgive murderers?" (November 10, 2015)

- "Semi-automatic pistol in Wikipedia" (November 10, 2015)

- "Shot placement for instant kill" (November 14, 2015)

The extraction reports also contained a photograph of Mr. Burns holding a 9-millimeter semi-automatic handgun, the same type used in the murder; text messages from Mr. Burns to another cousin (named JaJa) on November 13, 2015 in which Mr. Burns said, "I'm clapping him today" and "Everything already in motion . . . waiting on this Cali boy"; a log reflecting a phone call from Mr. Burns to JaJa at 9:50 p.m. on November 14, 2015; and a video and other postings on Mr. Burns's Instagram account suggesting that Mr. Burns went to New York City after the homicide to sell Mr. Osuchukwu's drugs and used the proceeds to buy a new car.

C. **Mr. Burns's Motion to Suppress the Fruits of the Warrants**

Mr. Burns moved before trial to suppress all of the data recovered from his phones. Citing *Riley v. California*, 573 U.S. 373 (2014), he asserted that modern smart phones merit the most stringent privacy protections under the Fourth Amendment and argued that the search warrants for his phones were overbroad, unsupported by probable cause, and lacking in particularity.

Detective Littlejohn testified at a pretrial evidentiary hearing on the motion. He stated that Mr. Burns was not a suspect at the time his phones were seized and that police had no information suggesting that any photographs or evidence of internet activity on the phones had any connection to the investigation of Mr. Osuchukwu's death. Detective Littlejohn stated further that he has applied for search warrants for "probably over 25 or so" cell phones in other cases and that the language he used in the search warrants for Mr. Burns's phones was "basically" the same "standard language" he has used in all of the cell phone search warrants for which he has applied.

The trial judge denied the motion to suppress, stating:

> I don't see a problem with the scope of this search warrant. There was a search warrant that was issued by another associate judge. Even if I saw . . . a problem with it, I don't know what I could do. I don't have authority to revoke a decision that one of my colleagues has made, but even if I did, I don't see a problem with it.

**D. <u>Analysis under the Warrant Clause</u>**

The Warrant Clause of the Fourth Amendment commands that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "These words are precise and clear." *Stanford v. Texas*, 379 U.S. 476, 481 (1965). "They reflect the determination of those who wrote the Bill of Rights that the people of this new Nation should forever 'be secure in their persons, houses, papers, and effects' from intrusion and seizure by officers acting under the unbridled authority of a general warrant." *Id*. (quoting U.S. Const. amend. IV). And through their creation of the dual constitutional mandates of probable cause and particularity, the words of the Warrant Clause are meant to deny police the ability "to rummage at will" through a person's private matters. *See Arizona v. Gant*, 556 U.S. 332, 345 (2009); *see also Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971).

The probable cause standard is well defined. A judge considering an application for a search warrant must determine whether, in light of all of the circumstances described in the supporting affidavit, "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). The affidavit thus "must demonstrate cause to believe" not only that an item of evidence "is likely to be found at the place to be searched," but also that there is "a nexus between the item to be seized and [the] criminal behavior" under investigation. *United States v. Griffith*, 867 F.3d 1265, 1271 (D.C. Cir. 2017) (quoting *Groh v. Ramirez*, 540 U.S. 551, 568 (2004); *Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294, 307 (1967)).

A judge's decision to issue a search warrant, moreover, may not be "a mere ratification of the bare conclusions of others." *Gates*, 462 U.S. at 239. Rather, an affidavit submitted in support of a warrant application must provide the judge "a substantial basis for determining the existence of probable cause" — *i.e.*, it must supply "[s]ufficient information" to enable the judge to make independent findings on the necessary elements of the probable cause standard. *Id.* Only in that way can the judge "perform his 'neutral and detached' function and not serve merely as a rubber stamp for the police." *Aguilar v. Texas*, 378 U.S. 108, 111 (1964) (quoting *Johnson v. United States*, 333 U.S. 10, 14 (1948)).

A search warrant affidavit therefore "must contain adequate supporting facts about the underlying circumstances to show that probable cause exists for the issuance of the warrant." *United States v. McPhearson*, 469 F.3d 518, 524 (6th Cir. 2006) (internal quotation marks omitted). The "particularized facts" and circumstances that must be set forth in the affidavit are essential to the judge's finding of "a fair probability that evidence of a crime will be located on the premises of the proposed search," *id.* (internal quotation marks omitted), and "form the central basis of the [judge's independent] probable cause determination," *United States v. Underwood*, 725 F.3d 1076, 1081 (9th Cir. 2013), thereby ensuring that any search authorized by a warrant "will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit," *Maryland v. Garrison*, 480 U.S. 79, 84 (1987).

By contrast, an affidavit that states only "suspicions, beliefs, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge, is a 'bare bones' affidavit, and fails to establish probable cause." *United States v. West*, 520 F.3d 604, 610 (6th Cir. 2008) (internal quotation marks omitted). As examples, some "bare bones" affidavits state that the

affiant "has cause to suspect and does believe" there is contraband or other evidence of a crime located on the premises to be searched, or that the affiant has "received reliable information from a credible person" to the same effect. *Gates*, 462 U.S. at 239 (first quoting *Nathanson v. United States*, 290 U.S. 41, 44 (1933); then quoting *Aguilar*, 378 U.S. at 109); *see also United States v. Pope*, 467 F.3d 912, 920 (5th Cir. 2006). Just as an unadorned, bare bones claim of probable cause based on an affiant's "training and experience" fails to provide the judge considering a warrant application a sufficient factual basis to assess compliance with the Fourth Amendment, *Underwood*, 725 F.3d at 1081, these "wholly conclusory statement[s]" give the judge "virtually no basis at all for making a judgment regarding probable cause," *Gates*, 462 U.S. at 239.

The particularity requirement — that a warrant "set out with particularity" the "scope of the authorized search," *Kentucky v. King*, 563 U.S. 452, 459 (2011) — "is closely tied to the requirement of probable cause," *Griffith*, 867 F.3d at 1275 (quoting 2 Wayne R. LaFave, *Search & Seizure* § 3.7(a) (5th ed. 2016)). It constrains law enforcement by "prevent[ing] the seizure of one thing under a warrant describing another," *Marron v. United States*, 275 U.S. 192, 196 (1927), and avoids the issuance of search warrants "on loose, vague[,] or doubtful bases of fact," *Go-Bart Importing Co. v. United States*, 282 U.S. 344, 357 (1931). With a

properly particularized warrant, it is the issuing judge who decides "what is to be taken," and "nothing is left to the discretion of the officer executing [it]," making "general searches . . . impossible." *Marron*, 275 U.S. at 196.

The privacy interests underlying these fundamental Fourth Amendment principles may be at their most compelling when police wish to search the contents of a modern smart phone. The Supreme Court held in *Riley* that police generally must obtain a search warrant before they may review the digital contents of a cell phone seized incident to arrest. 573 U.S. at 401. Writing for a unanimous Court, Chief Justice Roberts noted that modern cell phones contain "vast quantities of personal information," *id.* at 386, and are essentially "digital record[s] of nearly every aspect of their [owners'] lives — from the mundane to the intimate," *id.* at 395. The Chief Justice added that modern smart phones have "immense storage capacity" and typically hold "many distinct types of information" — emails, text messages, notes, photographs, videos, internet browsing histories, calendars, personal contacts, phone logs, etc. — all "dat[ing] back to the purchase of the phone, or even earlier." *Id.* at 393-94.

The Chief Justice emphasized that the collection of so much varied and sensitive information on a single device, carried almost everywhere by its owner,

facilitates in an unprecedented way the "reconstruct[ion]" of "[t]he sum of an individual's private life" and "convey[s] far more" about a person than could previously be found in the search of a physical space. *Id*. at 394. "An Internet search and browsing history, for example, . . . could reveal an individual's private interests or concerns — perhaps a search for certain symptoms of disease, coupled with frequent visits to WebMD." *Id*. at 395-96. GPS and other historical location information can pinpoint a person's physical location at all times of the day and night, going back weeks, months, and even years. *Id*. at 396. And the ever-present mobile applications, known as "apps," "offer a range of tools for managing detailed information about all aspects of a person's life," including political and religious affiliations, banking and other financial matters, addiction treatments, dating and romantic interests, pregnancy milestones, hobbies, and "buying or selling just about anything." *Id*. As a result, "a cell phone search would typically expose to the government far *more* than the most exhaustive search of a house: A phone not only contains in digital form many sensitive records previously found in the home; it also contains a broad array of private information never found in a home in any form." *Id*. at 396-97 (emphasis in original); *cf. Payton v. New York*, 445 U.S. 573, 589 (1980) (articulating the venerable, pre-*Riley* understanding that Fourth Amendment protections are never "more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home").

A search warrant for data on a modern smart phone therefore must fully comply with the requirements of the Warrant Clause. It is not enough for police to show there is probable cause to arrest the owner or user of the cell phone, or even to establish probable cause to believe the phone contains some evidence of a crime. To be compliant with the Fourth Amendment, the warrant must specify the particular items of evidence to be searched for and seized from the phone and be strictly limited to the time period and information or other data for which probable cause has been properly established through the facts and circumstances set forth under oath in the warrant's supporting affidavit. Vigilance in enforcing the probable cause and particularity requirements is thus essential to the protection of the vital privacy interests inherent in virtually every modern cell phone and to the achievement of the "meaningful constraints" contemplated in *Riley*, 573 U.S. at 399. As the Supreme Court recently reiterated, judges are "obligated — as 'subtler and more far-reaching means of invading privacy have become available to the Government' — to ensure that the 'progress of science' does not erode Fourth Amendment protections." *Carpenter v. United States*, 138 S.Ct. 2206, 2223 (2018) (quoting *Olmstead v. United States*, 277 U.S. 438, 473-74 (1928) (Brandeis, J., dissenting) (requiring that search warrants be obtained for cell-site location data generated from the use of smart phones and held by third-party providers)).

We conclude as a matter of law that the search warrants for Mr. Burns's cell phones did not satisfy the requirements of the Warrant Clause. The facts set forth in the warrants' supporting affidavits established probable cause to believe the phones contained text messages between Mr. Burns and Mr. Osuchukwu on November 14, 2015 and a log showing the precise time of the telephone call Mr. Burns reportedly made to his cousin (W-3) that night. The facts alleged in the affidavits also supplied probable cause to support a search of the GPS tracking features on the phones to determine Mr. Burns's whereabouts at pertinent times on November 14 and 15, 2015. But beyond those discrete items, the affidavits stated no facts that even arguably provided a reason to believe that any other information or data on the phones had any nexus to the investigation of Mr. Osuchukwu's death.

In lieu of facts, Detective Littlejohn simply stated it was his "belief" there was probable cause that evidence related to the homicide would be found on the phones — specifically, in the phones' subscriber and owner information, call logs, contact lists, voice mail and text messages, videos, photographs, and tweets. The detective added it was his "belief" this information could establish the whereabouts

of Mr. Burns's and W-3's phones at the time of the murder and "help identify potential witnesses, suspects and confederates yet unknown."

The affidavits were thus classic "bare bones" statements as to everything on Mr. Burns's phones for which Detective Littlejohn made a claim of probable cause beyond the three narrow categories of data for which the affidavits made proper factual showings. In approving a more expansive request, the warrant judge failed to fulfill his obligation to make an independent determination of probable cause, *Gates*, 462 U.S. at 239, and risked becoming "a rubber stamp for the police," *Aguilar*, 378 U.S. at 111.

The actual search warrants, moreover, went even further than Detective Littlejohn's unsupported assertions of probable cause in the affidavits and authorized the review of literally all of the data on both phones. The warrants allowed police to search for "[a]ll records" and "any evidence" on the phones related to violations of the District's first-degree murder statute and expressly sanctioned the search of several expansive categories of data Detective Littlejohn never even mentioned in the affidavits. Those categories included schedule and travel information; saved usernames and passwords; documents; and "[r]ecords of Internet activity, including firewall logs, caches, browser history and cookies,

'bookmarked' or 'favorite' web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses." As to these broad categories of data, the search warrants were issued based on nothing — not even a bare bones assertion of probable cause.

The warrants also lacked particularity, describing the objects of the search in the most general terms imaginable. Rather than specifying the three narrow items of evidence for which the affidavits established probable cause, the warrants broadly authorized the seizure of "any evidence" on the phones and listed, by way of examples, generic categories covering virtually all of the different types of data found on modern cell phones. The warrants imposed no meaningful limitations as to how far back in time police could go or what applications they could review and, instead, endorsed the broadest possible search without regard to the facts of the case or the limited showings of probable cause set forth in the affidavits.

In any context, a search warrant's "general description" of items to be seized, such as "records, mail, correspondence, and communications[,] is immediately suspect as being based upon nothing more than conjecture that such items related to the crime under investigation actually exist." 2 Wayne R. LaFave, *Search & Seizure* § 4.6(a) (5th ed. 2012 & 2019 update) (internal quotation marks

omitted). Particularly given the heightened privacy interests attendant to modern smart phones under *Riley*, it is thus constitutionally intolerable for search warrants simply to list generic categories of data typically found on such devices as items subject to seizure.

The absence of particularity in the warrants for Mr. Burns's phones is no doubt attributable to the use of a template. As Detective Littlejohn acknowledged at the pretrial suppression hearing, he used basically the same language he has used in at least twenty-five other cell phone warrants in listing the categories of evidence to be seized from the phones and the types of data for which he claimed the existence of probable cause.

"Templates are, of course, fine to use as a starting point." *United States v. Winn*, 79 F. Supp. 3d 904, 919 (S.D. Ill. 2015). "But they must be tailored to the facts of each case." *Id.*; *see United States v. Oglesby*, No. 4:18 CR 0626, 2019 U.S. Dist. LEXIS 71238, at *21-22 (S.D. Tex. April 26, 2019) (following *Winn*). Detective Littlejohn failed to do any tailoring of his template for cell phone search warrants, and as a result the warrants for Mr. Burns's phones did not state with particularity "the place to be searched, and the persons or things to be seized," as required by the Warrant Clause. Instead, the warrants "swe[pt] too broadly in

describing the items subject to seizure," *Griffith*, 867 F.3d at 1279, and allowed a "wide-ranging exploratory search[]" not "carefully tailored to its justifications" — precisely the type of unbridled rummaging "the Framers intended to prohibit," *Garrison*, 480 U.S. at 84.[2]

Other courts addressing the validity of cell phone search warrants in similar circumstances have come to the same conclusion we have reached here. *See, e.g.*, *Winn*, 79 F. Supp. 3d at 919-21; *United States v. Morales*, 77 M.J. 567, 574-76 (A. Ct. Crim. App. 2017); *Buckham v. State*, 185 A.3d 1, 15, 18-19 (Del. 2018); *Commonwealth v. Broom*, 52 N.E.3d 81, 88-90 (Mass. 2016); *State v. Henderson*, 854 N.W.2d 616, 631-34 (Neb. 2014); *People v. Thompson*, 116 N.Y.S. 3d 2, 3-4 (N.Y. App. Div. 2019).

In *Morales*, the case with the most closely analogous facts, police investigating an alleged sexual assault applied for a search warrant for a cell phone

---

[2] In the course of their extensive briefing before this court, the parties and amicus curiae have suggested various models regarding the specificity with which cell phone search warrants might be required to identify the data to be seized and/or the methods by which the searches are to be conducted. We decline to adopt any such model, as a declaration of definitive rules for the drafting and execution of all cell phone warrants is not necessary to our disposition. The complexities of delineating the proper scope and methods of execution of cell phone search warrants will be best addressed through case-by-case adjudications focused on fundamental Fourth Amendment principles and the facts of each case.

they had seized from the chief suspect in the case.  77 M.J. at 571.  The affidavit submitted in support of the warrant request described an inculpatory text message the suspect was reported to have sent to the complainant, but it presented no other facts to establish a nexus between the alleged assault and any other data that might be found on the phone.  *Id*.  The warrant issued by a magistrate nonetheless authorized a forensic examination of all of the phone's digital data, and in the course of the ensuing search, police reviewed a photo-editing application on the phone and came across three photographs of the actual assault as it was being committed.  *Id*. at 571-72.  The trial court denied a motion to suppress the photographs, and the suspect (by then the defendant) was convicted of the sexual assault.  *Id*. at 572-73.  The appellate court reversed, holding that although the warrant affidavit made out probable cause to search the defendant's text messages, the affidavit "provided no factual predicate" to search for photographs "and no factual basis to conduct an open-ended search of the phone's entire contents."  *Id*. at 577.  As here, the warrant thus violated the probable cause and particularity requirements of the Warrant Clause.  *Id*. at 575.

The government cites decisions of a few of the federal circuit courts for the proposition that a cell phone search warrant satisfies the Warrant Clause as long as the warrant limits the authority to search to evidence of a particular crime and is

supported by an affidavit establishing probable cause that at least some evidence of the crime specified in the warrant will be found in the phone's data. *See, e.g.*, *United States v. Bishop*, 910 F.3d 335, 337 (7th Cir. 2018); *United States v. Castro*, 881 F.3d 961, 965 (6th Cir. 2018); *United States v. Bass*, 785 F.3d 1043, 1049 (6th Cir. 2015). These decisions do not persuade us to alter our conclusion.

First, the decisions cited by the government mostly arose in circumstances in which the affidavits submitted in support of the warrants made robust showings of probable cause for a range of relevant evidence likely to be contained within the phones' data, without a way of knowing in advance precisely where within that data the evidence would be found. *See, e.g.*, *Bass*, 785 F.3d at 1050 ("At the time of the seizure, however, the officers could not have known where this information was located in the cell phone or in what format."); *see also Bishop*, 910 F.3d at 337 ("[A]s with filing cabinets [in an office], the incriminating evidence may be in any file or folder [on the phone].").

The same cannot be said here. Although Mr. Burns's text messages with Mr. Osuchukwu might have been stored in a third-party application (*e.g.*, Facebook, Instagram, WhatsApp) rather than in the standard messaging applications on the phones, it was readily apparent that those messages, like the

limited phone log information and GPS data for which probable cause also had been established, would *not* be found in Mr. Burns's internet search history, photographs, or any of the many other broad categories of data included in the unlimited, template-based search authorized by the warrants. The few discrete items for which probable cause had been shown could have been obtained through a targeted search of a tiny fraction of the phones' data.

Second, the cases cited by the government are not as definitive as the government suggests and, even if adopted, would not support the government's position here. *Bass* makes clear that a statement in a cell phone search warrant limiting the search to evidence of a particular crime is sufficient to satisfy the particularity requirement of the Warrant Clause only if a more specific description of the items subject to seizure could not reasonably be provided: "The proper metric of sufficient specificity is whether it was reasonable to provide a more specific description of the items at that juncture of the investigation." 785 F.3d at 1050 (quoting *United States v. Meek*, 366 F.3d 705, 716 (9th Cir. 2004)). *Bishop*, the case identified by the government at oral argument as its strongest, makes the same point: "[S]pecificity is a relative matter. A warrant may be thought 'too general' only if some more-specific alternative would have done better at protecting privacy while permitting legitimate investigation." 910 F.3d at 337.

The search warrants for Mr. Burns's phones did not satisfy the *Bass*/*Bishop* requirement, as they easily could have provided a more specific description of the items subject to seizure. The government has advanced no reason — and we can think of none — why, consistent with the narrow showings of probable cause in the supporting affidavits, the warrants could not have been limited to a search for Mr. Burns's text messages with Mr. Osuchukwu on November 14, 2015, the log revealing the precise time of Mr. Burns's phone call with his cousin later that night, and GPS data showing the locations of the phones on November 14 and 15, 2015. Thus, even if we were inclined to follow the decisions cited by the government, those decisions would not lead to a finding of sufficient particularity in this case.

The government also contends, as a matter of policy, that the warrants' extraordinary breadth was justified by the police department's need for leads in the investigation and Detective Littlejohn's view of Mr. Burns's phones as "a promising avenue for insight into how and why Mr. Osuchukwu had been killed." This argument must be rejected. A law enforcement officer's interest in discovering leads or otherwise furthering his investigation, no matter how understandable in the circumstances, is never an acceptable substitute for the

constitutionally required showing of probable cause that must be made before a search warrant may be issued. Police might often believe that data on a smart phone could shed light on the way a crime was committed or "help identify potential witnesses, suspects and confederates yet unknown," as the affidavits here surmised. But without a proper showing of probable cause, a search warrant is not available as a general investigative tool for law enforcement.

Questioning at oral argument fully exposed the weakness of the government's position. Asked whether a warrant authorizing a search of the entire contents of the cell phone used by the neighbor who called 911 on the night of Mr. Osuchukwu's death would have been permissible as long as the warrant expressly limited the data to be seized to evidence of the homicide, government counsel readily acknowledged that such a warrant would have been overbroad and unduly intrusive. The government thereby conceded, at least implicitly, that probable cause to believe the neighbor's phone contained a log showing the exact time of the 911 call — from which the time of the shooting, a material fact in the investigation, could have been inferred — would have been insufficient to support an unlimited warrant. The answer must be the same for the warrants for Mr. Burns's phones, as in both sets of circumstances the phones were reasonably

believed to contain only limited and discrete items of evidence related to the investigation.

In sum, the affidavits submitted by Detective Littlejohn in support of the search warrant applications established probable cause to look for and seize evidence likely to be found in at most three narrow categories of data on Mr. Burns's phones.  The warrants, however, authorized a far more extensive search and failed to describe the items to be seized with anywhere near as much particularity as the Constitution required in the circumstances.  Overbroad and lacking in probable cause and particularity, the warrants were therefore issued in violation of the Warrant Clause of the Fourth Amendment.

### E. <u>The Exclusionary Rule: the Good Faith Exception and Severability</u>

The government contends that the good faith exception to the exclusionary rule makes suppression of the data seized from Mr. Burns's phones unnecessary. In the alternative, the government argues that the invalid portions of the search warrants should be severed from the valid portions and that only the fruits of the invalid portions should be suppressed.  We are not persuaded by either argument.

"It has long been the law that evidence collected in violation of the Fourth Amendment is considered 'fruit of the poisonous tree' and generally may not be used by the government to prove a defendant's guilt." *Hooks v. United States*, 208 A.3d 741, 750 (D.C. 2019) (quoting *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)).  One exception to this general rule is the so-called "good faith exception" to the exclusionary rule, created in *United States v. Leon*, 468 U.S. 897 (1984). The Supreme Court held in *Leon* that evidence seized pursuant to a search warrant subsequently determined to be invalid is not subject to exclusion from the government's case-in-chief if the officers who executed the warrant acted in objectively reasonable reliance on the issuing magistrate's finding of probable cause.  *Id*. at 922.  The Court reasoned that where the officers have acted in an objectively reasonable manner, exclusion of the evidence does not deter unlawful police conduct and any legitimate benefit of the exclusionary rule's application is outweighed by the substantial cost to society of suppressing reliable evidence.  *Id*. at 915-22.

The Supreme Court stressed in *Leon* that the newly-created exception to the exclusionary rule is based on an "objective" standard of reasonableness.  *Id*. at 919 n.20.  Essential to the objective nature of the inquiry is the expectation that law enforcement officers "have a reasonable knowledge of what the law prohibits."  *Id*.

(citing *United States v. Peltier*, 422 U.S. 531, 542 (1975)). "The key to the exclusionary rule's effectiveness as a deterrent lies . . . in the impetus it has provided to police training programs that make officers aware of the limits imposed by the [F]ourth [A]mendment and emphasize the need to operate within those limits." *Id.* (internal quotation marks omitted). Evidence obtained pursuant to an invalid search warrant thus remains subject to suppression "if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment." *Id.* at 919 (quoting *Peltier*, 422 U.S. at 542). Ultimately, the inquiry comes down to "whether a reasonably well trained officer," reasonably knowledgeable about what the law prohibits, "would have known that the search was illegal despite the magistrate's authorization." *Id.* at 922 n.23.

The good faith exception, moreover, is itself subject to several exceptions expressly recognized in *Leon*. Specifically, the good faith exception is inapplicable where (1) the magistrate who issued the warrant "was misled by information in an affidavit that the affiant knew was false or would have known was false except for [the affiant's] reckless disregard of the truth"; (2) the issuing magistrate "wholly abandoned his [neutral and detached] judicial role"; (3) the affidavit submitted in support of the warrant was "so lacking in indicia of probable

cause as to render official belief in its existence entirely unreasonable"; or (4) the warrant was "so facially deficient — *i.e.*, in failing to particularize the place to be searched or the things to be seized — that the executing officers [could not] reasonably presume it to be valid." *Id.* at 923 (quoting *Brown v. Illinois*, 422 U.S. 590, 611 (1975) (Powell, J., concurring in part)). In each of these circumstances, suppression of any evidence seized pursuant to the invalid warrant is an appropriate remedy because the officer executing the warrant "will have no reasonable grounds for believing that the warrant was properly issued." *Id.*

The federal courts have consistently viewed "bare bones" search warrant affidavits as fitting squarely within the third exception to the good faith exception recognized in *Leon*. *See, e.g.*, *Griffith*, 867 F.3d at 1278-79 (declining to apply the good faith exception to evidence seized pursuant to a "bare bones" affidavit); *Underwood*, 725 F.3d at 1085 (equating a "bare bones" affidavit with an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable" (quoting *Leon*, 468 U.S. at 923)); *United States v. Craig*, 861 F.2d 818, 821 (5th Cir. 1988) (referring to the third *Leon* exception as the "bare bones affidavit exception"). We agree with this view and adopt it as part of our analysis. And given our earlier conclusion that the affidavits submitted here

were bare bones (or less), we conclude, on this ground alone, that the good faith exception provides the government no refuge from the exclusionary rule.

There is more in the record, however, that precludes application of the good faith exception in this case. As discussed above, Detective Littlejohn prepared the warrants using the boilerplate language of a template and made no effort to tailor their scope to the facts of the case or the slender showings of probable cause made in the supporting affidavits. The result was a pair of search warrants of truly extreme overbreadth — warrants that authorized a search of everything on both phones and listed internet browsing histories, web search terms, and photographs among the categories of items to be seized, even though, as the detective later acknowledged, he had no information that any such data related to the death of Mr. Osuchukwu. Indeed, the detective's knowledge at the time he submitted the warrants that Mr. Burns was not a suspect made the existence of any nexus between the great majority of the data on the phones and the crime under investigation even more unlikely.

These were obviously deficient warrants issued more than a year after the Supreme Court's decision in *Riley*, and any reasonably well-trained police officer with a reasonable knowledge of what the Fourth Amendment prohibits would have

known they were invalid notwithstanding their approval by a judge. The Metropolitan Police Department had an obligation to make its officers aware of the limits imposed by the Fourth Amendment and to emphasize the need to operate within those limits, but that training responsibility appears to have gone unfulfilled. For all of these reasons, the good faith exception to the exclusionary rule does not apply.

The government's severance argument fares no better. The government cites *United States v. Sells*, 463 F.3d 1148, 1154-55 (10th Cir. 2006), for the proposition that in certain circumstances a trial judge may sever the valid and invalid portions of a search warrant and allow the government to present any evidence seized pursuant to the valid portions while suppressing all evidence obtained pursuant to the invalid portions. Mr. Burns agrees that *Sells* provides the proper framework for our analysis but argues that the government cannot satisfy its requirements.

We briefly addressed the severability doctrine in *United States v. Ketterman*, 276 A.2d 243, 246-47 (D.C. 1971), and held there that the partial invalidity of a search warrant does not necessarily require the suppression of all evidence seized pursuant to the warrant. Instead, we stated, there are some situations in which a

partially invalid warrant can be severed and evidence seized pursuant to its valid portions admitted. *Id.* (quoting *Aday v. Superior Court of Alameda County*, 362 P.2d 47, 52 (Cal. 1961)).

*Ketterman*, however, did not define the requirements for a severance, and we have not revisited the severability doctrine in the nearly fifty years since the decision was issued. In the meantime, *Sells* has prescribed a three-part test under which severance is available only if there are valid portions of an otherwise invalid search warrant that (1) "describe[] with sufficient particularity items to be seized for which there is probable cause," 463 F.3d at 1156; (2) are "distinguishable from the invalid portions," *id.* at 1158 (internal quotation marks omitted); and (3) "make up the greater part of the warrant," *id.* (internal quotation marks omitted). There has been some disagreement within the federal courts over the specifics of the third element of the *Sells* test. *See Cassady v. Goering*, 567 F.3d 628, 657 (10th Cir. 2009) (McConnell, J., dissenting) (arguing that the valid parts of the warrant should have to be merely "not insignificant" rather than predominant). But all agree that the first two conditions delineated in *Sells* must be met; and as to the third, it bears noting that we felt it important to "emphasize" in *Ketterman* "that warrants essentially general in character may not be saved by minor items described with requisite particularity." 276 A.2d at 247 n.6.

We need not determine the precise contours of the severability doctrine — or to choose sides in the debate over the third element of the *Sells* test — because the government cannot show that the warrants for Mr. Burns's phones satisfied either of the first two elements. The warrants did not specifically authorize a search for Mr. Burns's text messages with Mr. Osuchukwu on November 14, 2015 or for any of the other discrete items for which the affidavits established probable cause. Thus, no portion of the warrants described with sufficient particularity (or even mentioned) any of the items that could have been permissible subjects of a search, and the warrants made no distinction between those few items and the broad and unsupported categories of data included within the warrants' template-based language. The warrants therefore had no valid portions that could be properly severed under any construction of the severability doctrine.

### F. **The Trial Judge's Role**

In denying Mr. Burns's pretrial motion to suppress, the trial judge stated that he had no authority to overrule the warrant judge's decision to issue the warrants for Mr. Burns's phones (and that he saw no problem with the warrants in any

event). This was an inaccurate statement of the role of a trial judge considering a motion to suppress evidence seized pursuant to a warrant issued by another judge.

The trial judge is responsible for deciding all pretrial motions to suppress, *see* D.C. Code § 23-104(a)(2) (2012 Repl.); Super. Ct. Crim. R. 12(d), including those seeking the suppression of evidence seized pursuant to search warrants. In carrying out this responsibility, the trial judge plays an indispensable role in the criminal process. No matter how awkward it might be to review the work of a colleague, the trial judge has an obligation to conduct a meaningful review of the validity of the warrant in dispute and the clear authority to come to a contrary conclusion from that reached by the issuing judge. As the Supreme Court stated in *Gates*, "courts must continue to conscientiously review the sufficiency of affidavits on which warrants are issued" to make sure, in each case, that the action of the issuing judge was not "a mere ratification of the bare conclusions of others." 462 U.S. at 239.

\*　　　\*　　　\*

For the reasons stated, the search warrants for Mr. Burns's phones were invalid, with constitutional deficiencies so obvious that any reasonably well-

trained police officer would have known the warrants were issued in violation of the Fourth Amendment notwithstanding their approval by a judge. The trial judge thus erred in denying Mr. Burns's motion to suppress the evidence seized pursuant to the warrants.

## II. The Chief Medical Examiner's Surrogate Expert Testimony

### A. The Homicide Investigation and the Autopsy Performed by the Deputy Medical Examiner

A brief summary of the police investigation leading to the autopsy performed on Mr. Osuchukwu's remains is essential to our analysis under the Confrontation Clause.

A Metropolitan Police Department patrol officer was the first to respond to the 911 call from Mr. Burns's mother on November 15, 2015. Five homicide detectives and four crime scene search officers followed soon thereafter, and all entered Apt. 23 at 2958 Second Street, S.E. and observed Mr. Osuchukwu's body on the living room floor. Bloodstains surrounded the body, and five spent cartridge casings and an unfired bullet were nearby.

A detective directed the crime scene search officers to collect and document evidence of the apparent homicide. The crime scene officers took photographs of the apartment and Mr. Osuchukwu's body, swabbed surfaces for DNA and fingerprints, and collected the cartridge casings and unfired bullet — all destined for forensic testing at the Department of Forensic Sciences. The detectives took witness statements from Mr. Burns, his mother, and his cousin.

Police promptly notified the Office of the Chief Medical Examiner (OCME) of the discovery of Mr. Osuchukwu's body. An OCME investigator went to the apartment and inspected Mr. Osuchukwu's remains, recording the way "the body was found on the scene, [the] injuries [on] the body, the level of rigor mortis; and the level of lividity, body temperature, [and] ambient temperature." OCME officials later transported Mr. Osuchukwu's remains to OCME for an autopsy.

Dr. Terrill L. Tops, a deputy medical examiner at OCME, performed an autopsy on Mr. Osuchukwu's remains on November 16, 2015. To document the autopsy, Dr. Tops made contemporaneous handwritten notes and diagrams memorializing his own observations and directed that photographs of the body be taken at each stage of the examination. Dr. Tops subsequently prepared a formal autopsy report in which he detailed the condition in which the body was received

at OCME; the procedures he followed in performing the autopsy; the physical evidence, including clothing and bullets, recovered during the examination; the location, dimensions, and path of each of four gunshot wounds suffered by Mr. Osuchukwu; and the injuries and amount of blood loss associated with each of those wounds. Based on his findings, Dr. Tops concluded in his report that the cause of death was multiple gunshot wounds and that the manner of death was homicide. All of these records of the autopsy were placed in an OCME file made specifically for the case.

One of the homicide detectives assigned to the investigation attended the autopsy. The detective was present throughout the examination and took possession of the clothing and bullets recovered during the procedure. Following the autopsy, the detective interviewed Dr. Tops about his findings and conclusions.

By contrast, Dr. Roger Mitchell, the Chief Medical Examiner, did not attend any part of the autopsy or have any involvement in the examination. Dr. Mitchell did sign the autopsy report in February 2016 as a reviewing official, but he took no notes in the case, did not otherwise participate in the drafting or review of the report, and made no edits to it.

**B. <u>Mr. Burns's Motion to Exclude the Chief Medical Examiner's Surrogate Expert Testimony</u>**

The government notified Mr. Burns's counsel a few weeks before trial that it intended to call Dr. Mitchell instead of Dr. Tops to testify as an expert witness about the results of the autopsy. As government counsel later explained at a pretrial hearing, Dr. Tops was no longer employed by OCME and was working in Florida by the time of trial. After speaking with Dr. Tops and Dr. Mitchell, the government decided to call Dr. Mitchell, who was still employed by OCME as Chief Medical Examiner.

Mr. Burns filed a motion *in limine* to exclude "the autopsy report and any attendant documents, as well as any testimony repeating the findings of these documents or the oral statements of the medical examiner." Mr. Burns argued in his written motion that any testimony by Dr. Mitchell "based, in any way, on the notes, findings, and/or conclusions of Dr. Tops would be unconfronted testimonial hearsay offered in violation of the Confrontation Clause of the Sixth Amendment."

The trial judge held a hearing on Mr. Burns's motion shortly before trial. The government opposed the motion, stating that Dr. Mitchell's testimony would be based only on the diagrams and photographs created during the autopsy and not on the contents of the autopsy report or any other writings generated by Dr. Tops. Mr. Burns's counsel argued in response that Dr. Mitchell had reviewed the autopsy report and the diagrams and photographs and that "all of those things will be the basis of his testimony and will adhere to hearsay."

The trial judge denied Mr. Burns's motion, explaining that Dr. Mitchell would be "relying on the type of information that expert witnesses rely on when they formulate an opinion and provide testimony at trial."

## C. The Chief Medical Examiner's Testimony at Trial

Despite its pretrial assurances, the government elicited testimony from Dr. Mitchell at trial that far exceeded whatever independent opinions Dr. Mitchell might have held based solely on a review of the autopsy diagrams and photographs. The government sought repeatedly to bolster Dr. Mitchell's credibility before the jury by presenting his opinions as consistent with Dr. Tops's findings and conclusions and as supported by the entirety of the autopsy records of

the case. In the process, Dr. Mitchell directly told the jury of several specific findings and conclusions made by Dr. Tops and indirectly suggested many others.

The government began by having Dr. Mitchell confirm he had reviewed the complete OCME file in the case, including the autopsy report, notes, and diagrams prepared by Dr. Tops and the photographs taken during the examination. Government counsel then asked Dr. Mitchell to state the conclusions reached by Dr. Tops at the time of the autopsy and to tell the jury whether he agreed with them. Dr. Mitchell summarized Dr. Tops's principal conclusions from the autopsy report — that the cause of death was multiple gunshot wounds and the manner of death a homicide — and stated his full agreement with those conclusions.

The discussion then moved on to the four gunshot wounds suffered by Mr. Osuchukwu. The government elicited from Dr. Mitchell that one of the diagrams drawn by Dr. Tops during the autopsy accurately reflected the locations of the gunshot wounds shown in the photographs. The diagram, one of three appended to the autopsy report, showed the location of each entrance and exit wound on the front and back of Mr. Osuchukwu's body and included Dr. Tops's handwritten notes of measurements taken during the autopsy to memorialize the precise size and distance of each wound from the midline or other part of the body.

Government counsel then gave Dr. Mitchell a blank sheet of paper and asked him to "more or less recreate" Dr. Tops's diagram in front of the jury. When Dr. Mitchell agreed to undertake the task, government counsel asked him if he needed to see the autopsy report as he re-drew Dr. Tops's diagram and answered questions about the gunshot wounds. Dr. Mitchell stated that, yes, he did need the autopsy report to be able to draw a copy of Dr. Tops's diagram, and government counsel marked the report (which included Dr. Tops's diagram) as an exhibit and gave it to Dr. Mitchell on the witness stand.

Dr. Mitchell proceeded to describe the entrance location, the trajectory inside the body, and, where applicable, the exit location of each of the four gunshot wounds. He told the jury that bullets entered Mr. Osuchukwu's body through the left cheek, left shoulder, left lower abdomen, and right lower back, with the two entering through the left shoulder and right lower back piercing the heart, lungs, and other vital organs and likely causing Mr. Osuchukwu's death. With regard to one of the gunshot wounds, Dr. Mitchell stated that he needed to "refer to the report" before he could answer a question about the wound's path inside the body.

Most of the government's questioning relating to the gunshot wounds, however, was focused on whether soot or stippling was found at any of the wound

sites. Dr. Mitchell described soot as burnt gunpowder that is propelled out of a firearm along with a bullet and is often deposited on the skin of the person shot when the firearm is fired from less than six to eight inches away. He described stippling as unburnt gunpowder that is also propelled out of a firearm and can cause abrasions to the skin when the firearm is fired from within twelve to eighteen inches of the person shot. The presence or absence of soot and stippling at the sites of the gunshot wounds was critical to the case, given Mr. Burns's defense that he fired at Mr. Osuchukwu at close range only after Mr. Osuchukwu rushed him and tried to take away his gun.

The government questioned Dr. Mitchell in detail about the four gunshot wounds to establish that no soot or stippling was found at the entrance location of any of the wounds. As worded, the government's questions directed Dr. Mitchell to base his testimony about the presence or absence of soot and stippling on his review of all of the materials in the autopsy file, including the photographs and the autopsy report, diagrams, and notes authored by Dr. Tops. Government counsel did not simply ask Dr. Mitchell whether he was able to see soot or stippling in the photographs of the gunshot wounds (which, for clarity, Dr. Mitchell referred to as Wounds A, B, C, and D). Instead, the government used passive-voice questions to

inquire, as to each of the wounds, whether, based on Dr. Mitchell's review of the entire file, soot or stippling was "observed":

Q: Was there soot observed in the entrance or exit wounds that are depicted before you in Government's Exhibit Number 24 [a photograph of Wound A]?

DEFENSE COUNSEL: Objection.

THE COURT: Overruled.

A: No.

. . .

Q: Based on your review of not only the photographs that have been put before you as to those wounds that you designated as A, but the entire file as well, was there stippling observed as to those wounds?

A: No.

. . .

Q: Now, is there soot observed on [Wound B]?

A: No.

Q: I guess I should say was there soot observed on [Wound B]?

A: No.

Q: And was there stippling observed on that wound?

A: No.

. . .

Q:     And looking at the photograph there, is there soot
        or stippling observed on [Wound C]?

A:     No.

Q:     Based on your review of the file, the photographs,
        the diagram and notes and everything observed in
        the file, was there soot or stippling observed on
        that wound in an unwashed condition?

A:     No.

. . .

Q:     And was there soot or stippling observed in the
        unclean observation – in the observation of
        [Wound D] uncleaned based on your review of the
        file?

A:     No.

Dr. Mitchell's responses to the government's initial questions about Dr.

Tops's ultimate conclusions, moreover, were not the only point at which Dr.

Mitchell referred directly to information in the autopsy report. As one additional

example, when government counsel asked Dr. Mitchell to describe any scars found

on Mr. Osuchukwu's body, Dr. Mitchell stated that he needed to refer to the report

before he could answer the question. He then reviewed the relevant portion of the

autopsy report and testified, contrary to Mr. Burns's claim of self-defense, that all

of the scars on Mr. Osuchukwu's body were healed, with none being a fresh abrasion or bruise that might have resulted from a scuffle.

Dr. Mitchell also gave testimony about several other aspects of the autopsy that appear to have been based on information in the autopsy report and other materials in the OCME file. He told the jury about the recovery of bullets from Mr. Osuchukwu's body and clothing during the autopsy, about the precise volume of blood found pooled in Mr. Osuchukwu's chest and abdomen at the time of the autopsy, and about the viewing of Mr. Osuchukwu's clothing in the course of the examination. No suggestion was or could have been made that any of this testimony was based on something other than Dr. Tops's writings.

Dr. Mitchell did testify to two opinions that were not included in the autopsy report. He told the jury that the steep upward path of the bullet entering through the right lower back was consistent with Mr. Osuchukwu "being — or his chest at the very least being parallel to the floor" when that shot struck him. And he said there was "a possibility" that pink discoloration of the tissue beneath the entrance wound on the left lower abdomen indicated that the muzzle of the gun was "flush up against" Mr. Osuchukwu's belly at the time the shot was fired.

The government formally moved the autopsy photographs into evidence. Mr. Burns raised no further objection beyond his pretrial motion *in limine*, and the photographs were admitted. However, despite the many direct and indirect references in Dr. Mitchell's testimony to the autopsy report and other materials in the OCME file, the government never moved the autopsy report, notes, or diagrams into evidence, and none of those items was admitted.

### D. Analysis Under the Confrontation Clause

The Confrontation Clause of the Sixth Amendment guarantees the accused "[i]n all criminal prosecutions . . . the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. In *Crawford v. Washington*, 541 U.S. 36 (2004), the Supreme Court held that the clause precludes the government from presenting evidence of the "testimonial statements" of a witness who will not testify at trial unless the witness is unavailable and the defendant has had a prior opportunity to cross-examine him. *Id*. at 68-69. "The Constitution prescribes a procedure for determining the reliability of testimony in criminal trials, and we, no less than the state courts, lack authority to replace it with one of our own devising." *Id*. at 67. "Where testimonial statements are at issue, the only indicium of

reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." *Id*. at 68-69.

Subsequent decisions of both this court and the Supreme Court have addressed an array of subsidiary issues left undecided in *Crawford*. Our analysis of Dr. Mitchell's testimony is guided by three important principles that have emerged from those decisions.

First, forensic evidence is not exempt from the requirements of the Confrontation Clause. *Jenkins v. United States*, 75 A.3d 174, 180 (D.C. 2013); *Young v. United States*, 63 A.3d 1033, 1039 (D.C. 2013). "Serious deficiencies have been found in the forensic evidence used in criminal trials," and the right to confrontation guaranteed by the Constitution "is designed to weed out not only the fraudulent analyst, but the incompetent one as well." *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 319 (2009).

Second, the government cannot avoid the requirements of the Confrontation Clause by presenting an expert witness to testify as a surrogate for the person who performed a forensic examination. *Jenkins*, 75 A.3d at 180. "Permitting the defendant to cross-examine a surrogate expert who did not personally perform or

observe the forensic analysis at issue is not a constitutionally permissible substitute for cross-examination of the scientist who actually did the testing." *Young*, 63 A.3d at 1039; *accord Bullcoming v. New Mexico*, 564 U.S. 647, 661-62 (2011) ("[S]urrogate [expert] testimony . . . could not convey what [the performing forensic analyst] knew or observed about the events his certification concerned, *i.e.*, the particular test and testing procedure he employed. Nor could such surrogate testimony expose any lapses or lies on the certifying analyst's part.").

And third, the "dispositive question" whenever the government seeks to present an expert witness to testify about a forensic examination the expert did not perform or observe is whether the expert will relay testimonial hearsay statements of others regarding the examination. *Young*, 63 A.3d at 1044. This is a question of law, subject to our *de novo* review on appeal.[3] *Id*.; *Thomas v. United States*, 978

---

[3] Citing *Jones v. United States*, 127 A.3d 1173, 1187 (D.C. 2015), the government argues that Mr. Burns's Confrontation Clause claim should be limited to plain error review on appeal because Mr. Burns failed to object at trial when Dr. Mitchell's testimony exceeded the promised limits on which the trial court based its pretrial decision to allow the testimony. We are not persuaded. Mr. Burns filed a pretrial motion *in limine* raising the same constitutional arguments he now advances before us. When the trial judge indicated at a pretrial hearing that he was inclined to deny Mr. Burns's motion in light of the government's assurances that Dr. Mitchell's testimony would be based solely on the autopsy photographs and diagrams — and not on the autopsy report — Mr. Burns argued that the testimony would still "adhere to hearsay" in violation of the Confrontation Clause. The trial judge disagreed and denied Mr. Burns's motion. Mr. Burns then renewed his

(continued…)

A.2d 1211, 1225 (D.C. 2009). The question has two parts: (1) whether the expert transmitted hearsay; and (2) if so, whether that hearsay was testimonial. *Young*, 63 A.3d at 1044.

We begin by addressing whether Dr. Mitchell transmitted hearsay statements of Dr. Tops.

"An out-of-court statement offered in evidence to prove the truth of the matter asserted is hearsay whether the statement is quoted verbatim or conveyed only in substance; [and] whether it is relayed explicitly or merely implied[.]" *Young*, 63 A.3d at 1044 (footnote omitted). The fact "that a written forensic analysis report was not formally entered into evidence, or that [the testifying expert] did not read verbatim from any such report, is [therefore] not determinative." *Id.* Instead, "[t]he appropriate question is whether the substance

(continued…)
objection on several occasions at trial when the government's breaches of its pretrial assurances were most egregious — specifically, when the government asked Dr. Mitchell to tell the jury whether soot was "observed" on Wound A at the time of the autopsy, again when government counsel asked Dr. Mitchell to identify the location within Mr. Osuchukwu's body at which Dr. Tops found a bullet had become lodged, and a third time when the government asked Dr. Mitchell to indicate whether Mr. Osuchukwu's clothing was viewed and photographed during the autopsy. The trial judge overruled all of the objections. In the circumstances, *Jones* required no more of Mr. Burns, who we conclude properly preserved his Confrontation Clause claim for our *de novo* review of the trial judge's rulings.

of the testimonial materials is shared with the fact-finder to suggest its truth, without the report's author being available for cross-examination." *Id.* (quoting David H. Kaye, David E. Bernstein & Jennifer L. Mnookin, *The New Wigmore: Expert Evidence* § 4.10.2, at 200 (2d ed. 2011)); *see also Gardner v. United States*, 999 A.2d 55, 61 (D.C. 2010) ("[A]n expert's use of testimonial hearsay is a matter of degree. The question is whether the expert is, in essence, giving an independent judgment or merely acting as a transmitter for testimonial hearsay." (emphasis and internal quotation marks omitted)).

In its arguments to this court, the government departs from its pretrial promise that Dr. Mitchell's testimony would be based on the autopsy photographs and diagrams and asserts instead that Dr. Mitchell based his testimony primarily on an independent review of the photographs alone. The government pairs this assertion with an argument that autopsy photographs are not testimonial.

The record contradicts the government's assertion about the nature of Dr. Mitchell's testimony at trial. Even though the photographs were the only items from the OCME file formally admitted in evidence, the government and Dr. Mitchell made clear to the jury throughout Dr. Mitchell's testimony that his

opinions were based on all of the materials in the file, including the autopsy report, diagrams, and notes written by Dr. Tops.

More important, Dr. Mitchell's testimony was not merely "based on" Dr. Tops's hearsay statements; the testimony clearly conveyed the substance of those statements to the jury. The government's questions repeatedly indicated that Dr. Mitchell's opinions came from the materials in the OCME file and were consistent with the findings and conclusions reached by Dr. Tops. Government counsel provided Dr. Mitchell a copy of Dr. Tops's autopsy report to review on the witness stand. Dr. Mitchell directly recited Dr. Tops's final conclusions from the report and stated his agreement with them. He said on several occasions that he needed to refer back to the report before he could answer a question. He did his best to recreate Dr. Tops's diagram of the four bullet wounds by drawing a copy of the diagram in front of the jury. He provided specifics about the recovery of bullets and clothing during the autopsy and the precise volume of blood pooled inside Mr. Osuchukwu's chest and abdomen — information that surely came from the autopsy report and notes. And as detailed in the testimony excerpted above, he answered the government's passive-voice questions about soot and stippling in a way that clearly, if indirectly, communicated to the jury Dr. Tops's first-hand observations, set forth in the autopsy report, that no soot or stippling was observed

at the time of the autopsy around the four entrance wounds on Mr. Osuchukwu's body.

Thus, although a small part of Dr. Mitchell's testimony was grounded in his own independent opinions — that Mr. Osuchukwu's chest was parallel to the floor when a bullet entered his right lower back, and that there was a possible contact wound to Mr. Osuchukwu's belly — the great majority of Dr. Mitchell's testimony was focused on transmitting the substance of the findings and conclusions made by Dr. Tops during the autopsy. The government presented Dr. Mitchell to the jury far more as a "transmitter" of the hearsay in the autopsy report and other OCME materials than as an expert communicating his own independent judgment. *See Gardner*, 999 A.2d at 61.

Moreover, virtually all of the materials in the OCME file contained hearsay. The handwritten notes Dr. Tops took during the autopsy and the formal typewritten report he drafted later both consisted entirely of Dr. Tops's out-of-court statements describing the examination and memorializing his observations, findings, and conclusions. And the diagrams Dr. Tops prepared during the autopsy included his handwritten notations specifying, among other things, the exact locations, sizes, and directions of the four gunshot wounds.

Finally, concerning this first prong of our analysis, it is important to note that the trial judge did not instruct the jury, as urged by our precedents, that the hearsay bases of Dr. Mitchell's opinions were being presented only for the limited purpose of assisting the jury in assessing the reasonableness of the opinions and were not to be considered as substantive evidence. *See In re Amey*, 40 A.3d 902, 911 (D.C. 2012); *In re Melton*, 597 A.2d 892, 906-07 (D.C. 1991) (en banc). As a matter of law, therefore, all of the hearsay statements in the OCME materials conveyed to the jury through Dr. Mitchell's testimony came in as substantive evidence, admitted as proof of the truth of the matters asserted therein by Dr. Tops. *See Jenkins*, 75 A.3d at 190-91; *Young*, 63 A.3d at 1046-47; *Gardner*, 999 A.2d at 60-61.

This violated the Confrontation Clause if any of those hearsay statements was testimonial. We thus turn to the second part of the question before us: the extent to which the hearsay statements in the OCME materials were testimonial within the meaning of *Crawford* and the Sixth Amendment.

To be "testimonial," a hearsay statement "must have been made, primarily, for an evidentiary purpose." *Young*, 63 A.3d at 1040. This means that the

statement "must [have been either] 'a solemn declaration or affirmation made for the purpose of establishing or proving some fact' for use in the prosecution or investigation of a crime, or a statement made under 'circumstances objectively indicating that' the declarant's 'primary purpose was to establish or prove past events potentially relevant to later criminal prosecution.'" *Id*. at 1039-40 (quoting *Crawford*, 541 U.S at 51; *Davis v. Washington*, 547 U.S. 813, 822 (2006)). "A statement made primarily for a different purpose, such as enlisting police assistance to 'meet an ongoing emergency,' is not testimonial." *Id*. at 1040 (quoting *Davis*, 547 U.S. at 822).

It is clear from the record that the primary purpose of the autopsy performed on Mr. Osuchukwu's remains was to develop forensic evidence of the cause and manner of Mr. Osuchukwu's death for use in the ongoing police investigation and any subsequent criminal prosecution. Mr. Osuchukwu's body had been discovered the day before in a setting that overwhelmingly suggested the commission of a crime, and an active law enforcement investigation was in progress at the time of the autopsy, with a detective present to observe the examination and take custody of any bullets, clothing, or other evidence recovered. In the circumstances, any objectively reasonable forensic pathologist would have understood that the

principal purpose of the autopsy and its documentation was to further the criminal investigation.

Dr. Tops certainly recognized this reality. Everything he did to document his findings — from his written notes and diagrams memorializing the precise location, size, and direction of each gunshot wound; to the scores of photographs he directed be taken at all stages of the examination; to the formal autopsy report he subsequently submitted within OCME — was done to generate reliable and readily understandable evidence of his findings and conclusions relating to the cause and manner of Mr. Osuchukwu's death.

Indeed, statutory provisions defining OCME's duties and responsibilities effectively compel the conclusion that an autopsy performed with knowledge of an active and ongoing police homicide investigation has as its primary purpose the development of forensic evidence for use in the investigation and any subsequent criminal prosecution. By law, OCME is required to investigate all deaths likely to be the subjects of criminal investigations, including "[v]iolent deaths"; "[s]udden, unexpected[,] or unexplained deaths"; "[d]eaths under suspicious circumstances"; and "[d]eaths for which the Metropolitan Police Department, or other law enforcement agency, or the United States Attorney's Office requests, or a court

orders[,] investigation." D.C. Code § 5-1405(b)(1), (2), (3), (11) (2019 Repl.). Police must "promptly notify the OCME" of any death requiring OCME investigation, *id*. § 5-1406(b), and OCME is authorized to "respond to the scene of the death" and must "take charge of the body" upon such notification, *id*. § 5-1406(a). "If, in the opinion of the [Chief Medical Examiner], or the United States Attorney, further investigation as to the cause and manner of death is required," then an OCME or other qualified forensic pathologist must perform "an autopsy of the body of the decedent" and "retain tissues and biological specimens deemed necessary to an investigation." *Id*. § 5-1409(b). The forensic pathologist who conducts the examination must "make a complete record of the findings and conclusions of [the] autopsy" and "prepare a report thereon." *Id*. § 5-1409(c). OCME must maintain "full and complete records and files" relating to all autopsies, *id*. § 5-1412(a), and retain records "related to an open investigation of a homicide . . . for 65 years," *id*. § 5-1412(a-1). Finally, autopsy records maintained by OCME are "admissible as evidence in any court in the District," *id*. § 5-1413, making plain their primary evidentiary purpose, at least when prepared with knowledge of a related criminal investigation.

Perhaps most unambiguously indicative of the primacy of OCME's evidentiary purpose in performing certain autopsies, however, is an introductory

statement in OCME's own standard operating procedures.  In an SOP issued just a

few months before Dr. Tops performed the autopsy on Mr. Osuchukwu's remains,

OCME instructed its forensic pathologists:

> The medical examiner should approach the decedent and postmortem examination as *evidence to be presented in court*.  This is best accomplished by thorough written, diagrammatic, and photographic documentation of the examination at the time of the original examination.

D.C. Office of the Chief Medical Examiner, Standard Operating Procedure:

Postmortem Examination Types § 1.1 (2015) (emphasis added),

https://ocme.dc.gov/sites/default/files/dc/sites/ocme/publication/attachments/Postm

ortem%20Examination%20Types.pdf  https://perma.cc/V38T-R23N.  It is difficult

to imagine a clearer statement of the primary evidentiary purpose of an autopsy

performed in conjunction with an active police homicide investigation.


The D.C. Circuit reached the same conclusion in *United States v. Moore*,

651 F.3d 30 (D.C. Cir. 2011), a case in which multiple defendants were tried on

charges of conspiracy and other felonies involving thirty-one murders.  *Id*. at 39.

At trial, the government called the then-Chief Medical Examiner to testify to the

contents of approximately thirty autopsy reports authored by other pathologists in

his office, even though the Chief Medical Examiner did not perform or attend any

of the autopsies. *Id*. at 71. The trial court admitted the autopsy reports in evidence over the defendants' Confrontation Clause objections. *Id*.

The D.C. Circuit found constitutional error on appeal. *Id*. at 72. Citing, among other things, the context of an ongoing criminal investigation into shooting deaths, the presence of detectives and mobile crime lab officers at several of the autopsies, and the formality of the autopsy reports, the court concluded that the autopsy reports were testimonial statements within the meaning of *Crawford* and the Confrontation Clause:

> Law enforcement officers thus not only observed the autopsies, a fact that would have signaled to the medical examiner that the autopsy might bear on a criminal investigation, they participated in the creation of reports. Furthermore, the autopsy reports were formalized in signed documents entitled "reports." These factors, combined with the fact that each autopsy found the manner of death to be a homicide caused by gunshot wounds, are "circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."

*Id*. at 73 (quoting *Melendez-Diaz*, 557 U.S. at 310).

The government nonetheless urges us to deem all autopsy records non-testimonial, stating that autopsies are conducted in a wide array of circumstances, often without any connection to any ongoing or anticipated criminal investigation

or prosecution. As examples, the government points to statutory requirements that OCME perform autopsies not only in the crime-related contexts cited above, but also where there have been "[d]eaths of persons whose bodies are to be cremated, dissected, buried at sea[,] or otherwise disposed of"; "[d]eaths related to disease resulting from employment or on-the-job injury or illness"; "[d]eaths related to disease which might constitute a threat to public health"; "[d]eaths of persons who are wards of the District of Columbia government"; "[d]eaths related to medical or surgical intervention"; "[d]eaths of persons while in legal custody of the District"; "[f]etal deaths related to maternal trauma"; and "[d]ead bodies brought within the District of Columbia without proper medical certification." D.C. Code § 5-1405(b)(4), (5), (6), (7), (8), (9), (10), (12).

We recognize that not every autopsy conducted in the District of Columbia has as its primary purpose the creation and documentation of forensic evidence for use in a criminal investigation or prosecution. We also presume the accuracy of data in a recent OCME annual report showing that the manner of death was determined to be homicide in fewer than 16% of the autopsies OCME performed in 2016. *See* D.C. Office of the Chief Medical Examiner, 2016 Annual Report 9 (2017),

https://ocme.dc.gov/sites/default/files/dc/sites/ocme/2016%20OCME%20Annual%

20Report%20FINAL%2011%2030%2017%20v3.pdf        https://perma.cc/44NV-R6UN.

But we must reject the government's argument that all autopsy records are non-testimonial simply because many autopsies are performed primarily to serve governmental interests other than the development of forensic evidence for use in criminal investigations. At least where the person whose remains are being autopsied appears to be the victim of a homicide and the forensic pathologist performing the examination knows of or anticipates the commencement of a law enforcement investigation into the person's death, we can say with assurance that the autopsy's primary purpose is evidentiary. Any objectively reasonable pathologist performing an autopsy in those circumstances would understand that the main purpose of the examination and its documentation is to develop forensic evidence of past facts relevant to the cause and manner of death for use in the investigation and any later criminal prosecution.

We thus hold that the hearsay statements in the autopsy report, notes, and diagrams conveyed to the jury by Dr. Mitchell were testimonial within the meaning of *Crawford* and the Sixth Amendment. Although the materials were prepared in differing formats and with varying levels of formality, all were created in the

context of an ongoing criminal investigation of a suspected homicide and for the primary evidentiary purpose of communicating and explaining Dr. Tops's findings and conclusions regarding the cause and manner of Mr. Osuchukwu's death.

The question whether any hearsay contained within the autopsy photographs was testimonial is more nuanced. The government argues that a reference to "non-testimonial photographs" in *Mungo v. United States*, 987 A.2d 1145, 1154 (D.C. 2010), constitutes a binding decision on the issue, while Mr. Burns contends that the reference was a mere stray comment made in the context of a plain error analysis.

We need not determine whether *Mungo*'s reference to non-testimonial photographs has any precedential value. As we have already concluded, the government's assertion that Dr. Mitchell's testimony was based primarily on the autopsy photographs is not supported by the record, and Dr. Mitchell communicated to the jury a substantial amount of testimonial hearsay contained within the other materials in the autopsy file.

We accordingly conclude that Dr. Mitchell transmitted Dr. Tops's testimonial hearsay statements to the jury. Because Dr. Tops was not shown to be

unavailable, and because Mr. Burns had no prior opportunity to cross-examine him in any event, Dr. Mitchell's testimony was admitted in violation of the Confrontation Clause of the Sixth Amendment. *See Crawford*, 541 U.S. at 68-69.

## III.   Prejudice

An error of constitutional magnitude in the trial court requires reversal of a criminal conviction on appeal unless the government establishes that the error was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 24 (1967).   Where multiple errors have occurred, their impact must be viewed cumulatively in determining whether the government has met its burden. *Sims v. United States*, 213 A.3d 1260, 1272 (D.C. 2019).   Mr. Burns's convictions therefore must be reversed unless they were "surely unattributable" to the erroneous admission of his cell phone data and Dr. Mitchell's testimony, considered in combination. *See Jenkins*, 75 A.3d at 192 (quoting *Kaliku v. United States*, 994 A.2d 765, 775 (D.C. 2010)).

The government has not made the requisite showing.  The cell phone data was the centerpiece of the government's case, and Mr. Burns's internet search history, in particular, was critical to the government's proof of premeditation and

deliberation.  As government counsel put it in his opening statement to the jury, Mr. Burns's cell phones "contain the evidence . . . that traces the thoughts, the actions, the movements, and everything else pertaining to Mr. Burns having to do with the murder of Mr. Onyekachi Osuchukwu."  Dr. Mitchell's testimony about the absence of soot and stippling at the sites of the four gunshot wounds was similarly essential to the government's success in disproving beyond a reasonable doubt Mr. Burns's claim of having shot Mr. Osuchukwu in self-defense at very close range.

Mr. Burns's convictions, accordingly, must be *reversed*.

APPENDIX

15 CRC 2415 COPY

TO: THE CHIEF OF POLICE OR ANY AUTHORIZED AGENT THEREOF

(Specific Law Enforcement Officer or Classification of Officer of the Metropolitan Police Department or other Authorized Agency)

Affidavit, herewith attached, having been made before me by    Detective Lee Littlejohn (D2-1456)

that he has probable cause to believe

that on the (person) (premises) (vehicle) (object) known as    Black mirror finish "LG" cellular telephone, telephone number

(202) 760-8490, seized from Witness #2 on Sunday, November 15, 2015

in the District of Columbia, there is now being concealed certain property,    Namely,

All records in that phone as listed in Attachment B contained in the Affidavit in Support of an Aplication for Search Warrant which

is incorporated herein by reference,

which is _____ Evidence relating to a homicide _____ and as I am satisfied

(Alleged grounds for seizure)

that there is probable cause to believe that the property so described is being concealed on the above designated (person) (premises) (vehicle) (object) and that the foregoing grounds for issuance of the warrant exist.

YOU ARE HEREBY AUTHORIZED within 10 days of the date of issuance of this warrant to search in the daytime/at any time of the day or night, the designated (person) (premises) (vehicle) (object) for the property specified and if the property be found there.

YOU ARE COMMANDED TO SEIZE IT, TO WRITE AND SUBSCRIBE an inventory of the property seized, to leave a copy of this warrant and return to file, a further copy of this warrant and return with the Court on the next Court day after its execution.

Issued this 25th day of    November    , 20 15

Cntz E. von Kau

Judge, Superior Court of the District of Columbia

**RETURN**

I received the above detailed warrant on    November 25    , 20 15 and have executed it as follows:

On    November 30    , 20 15 , at    2:45 pm    M.I searched the

(person) (premises) (vehicles) (object) described in the warrant and I left a copy of the warrant and return with

John Marsh (Electronic Device Forensic Examiner)    properly posted.

(Name of person searched or owner, occupant, custodian or person present at place of search)

The following is an inventory of the property taken pursuant to this warrant:

Data Files

This inventory was made in the presence of    John Marsh

I swear that this is a true and detailed account of all property taken by me under this warrant.

Set. Dee Littlejohn

Executing Officer

Subscribed and sworn to before me this    9th    day of    Dec    , 20 15

R Werth

Judge, Superior Court of the District of Columbia

Form CD(17)-1055 / Mar. 89
9-2794 wd-234

## ATTACHMENT A

15cnc2415

The property to be searched is a **BLACK MIRROR FINISH "LG" CELLULAR TELEPHONE, TELEPHONE NUMBER (202) 760-8490, SEIZED FROM WITNESS #2 ON SUNDAY, NOVEMBER 15, 2015,** hereinafter the "Device." The Device is currently located at the Metropolitan Police Department Criminal Investigations Division Homicide Branch in Washington, D.C.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

9

15 cnc 2415

**ATTACHMENT B**

1.      All records on the Device described in Attachment A that relate to violations of D.C. Code, Section 22-2101, including:

      a.   any evidence related to the aforementioned homicide that occurred on or about November 15, 2015;

      b.   any identifying information of the owner/possessor, and or owner/possessor's friends acquaintances, and/or relatives ;

      c.   any information recording the owner/possessor's schedule or travel or location from October 1 to November 16, 2015;

2.      Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, texts, tweets, phonebooks, saved usernames and passwords, documents, and browsing history;

3.      Records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

**METROPOLITAN POLICE DEPARTMENT**
Washington, D.C.

# Affidavit in Support of an Application for Search Warrant

☐  **United States
District Court**

[x]  **Superior Court of the
District of Columbia**

---

I, Lee Littlejohn of the Metropolitan Police Department in Washington, DC (MPD), being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.      Your affiant, Detective Lee Littlejohn, has been a sworn member of the Metropolitan Police Department for Twenty-one years. Your affiant is currently assigned to the Criminal Investigations Division, Homicide Branch.

3.      Since this affidavit is being submitted for the limited purpose of supporting probable cause, your affiant has not included every fact known to him or conveyed to him concerning this investigation. He has set forth only those facts that he believes are necessary to establish probable cause that a violation of the laws for the District of Columbia has been committed and that evidence or property that constitutes the commission of a criminal offense, and/or property designed or intended for use or which is or has been used as the means of committing a criminal offense may be found in the location requested to be searched.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

4.    The property to be searched is a **BLACK MIRROR FINISH "LG" CELLULAR TELEPHONE, TELEPHONE NUMBER (202) 760-8490, SEIZED FROM WITNESS #2 ON SUNDAY, NOVEMBER 15, 2015,** hereinafter the "Device." The Device is currently located at the Metropolitan Police Department Criminal Investigations Division Homicide Branch in Washington, D.C.

5.    The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

6.    On Sunday, November 15, 2015, at approximately 4:10 p.m., members of the Seventh District Patrol received a radio run for the report of an unconscious person at 2958 2nd Street, Southeast, apartment #23, Washington, D.C. Upon arrival, officers and the D.C. Fire Department EMS Medic #33 discovered the decedent, an adult male later identified as Onyekachi Emmanuel Osuchukwu III, twenty-four years old, lying in the prone position on the living room floor, unconscious and unresponsive, suffering from apparent gunshot wounds. There were (5) cartridge casings and (1) cartridge located near the decedent. Medic #33 began assessing the victim's injuries. The victim was found with no signs of life and death was apparent. The victim remained on the scene. Meanwhile, a cursory search of the apartment yielded negative results for any additional victims. Investigator Katherine Kim from the D.C. Medical Examiner's Office responded to the scene. The decedent's remains were transported to the D.C. Medical Examiner's Office pending an autopsy. The following morning, the decedent was pronounced dead at 8:48 a.m., by PA-C/MLI Denise Lyles of the D.C. Medical Examiner's Office.

7.    On Monday, November 16, 2015, Dr. Terrill Tops performed an autopsy on the remains of the decedent. Dr. Tops concluded that the cause of death was multiple gunshot wounds to the torso. The manner of death was ruled a homicide.

8.    An investigation into this offense was undertaken by members of the Criminal Investigations Division Homicide Branch of the Metropolitan Police Department. While on the scene, officers and detectives obtained information that on Saturday, November 14, 2015, at

2

approximately 8:53 p.m., a tenant in the building reported hearing the sound of gunshots. Members of the Seventh District responded to 2958 2nd Street, S.E., Washington, D.C., and found no evidence relating to a shooting. Your affiant reviewed the 911 call and the caller reported hearing six gun shots followed by a lady's voice and then heard someone run out of the building. The caller ran to ITS window, but didn't see anyone. A police report was taken for the sound of gunshots under CCN (Central Complaint Number) 15-182211.

9. An interview was conducted with Witness #1, hereafter referred to as W-1. W-1 is an occupant of said apartment who stated that the decedent and W-2 are best friends. W-1 stated the decedent arrived in Washington, D.C., on Saturday, November 14, 2015, from California. W-1 doesn't know exactly at what time the decedent arrived. W-1 left ITS residence on Friday, November 13, 2015, and stayed the weekend with other family members. W-1 returned to ITS residence on Sunday, November 15, 2015, along with W-2 and their cousin. Upon opening the apartment door they discovered the decedent lying on the living room floor. W-1 wasn't sure if the apartment door was locked or unlocked. W-1 called 911 and advised the dispatcher that the decedent was unconscious and unresponsive. W-1 overheard W-2 telling the police that IT left the apartment door unlocked for the decedent to gain access to the apartment.

10. Homicide Detectives on the scene spoke briefly to Witness #2, hereafter referred to as W-2. W-2 stated that family members collectively gathered money and purchased the decedent an airline ticket to Washington, D.C. W-2 stated IT exchanged text messages with the decedent throughout the day. W-2 stayed at the apartment waiting for the decedent's arrival. According to W-2, the last communications via text with decedent was around 7:30 p.m. W-2 decided to leave the apartment to meet with friends and left the apartment door unlocked so that the decedent could gain access to the apartment. W-2 didn't return to the apartment until the following day. Detectives attempted to ask W-2 additional questions, but W-2 refused to provide any additional information. W-2 was found to be in possession of two cellular telephones at the time, which were seized pending the issuance of a D.C. Superior Court search warrant to have them processed. One of those phones was the LG Cellular Phone # 202-760-8490. A search warrant was obtained for 2958 2nd Street, Southeast, Apartment #23, Washington, D.C. A search of the apartment revealed neither the decedent's cellular telephone nor his wallet was found. Clothing articles belonging to the decedent to include mail matter

3

bearing the decedent's name and a cellular telephone charger cord was found in a plastic bag near the doorway.

11.     An interview was conducted with Witness #3, hereafter referred to as W-3. W-3 stated that sometime on the night of Saturday, November 14, 2015, W-3 spoke to W-2 by cellular. W-2 stated he was expecting the decedent to arrive at the apartment and since he had not shown-up, W-2 was going to leave the apartment door unlocked for him. Later that evening, W-3 met W-2 at a female's house in Southeast, Washington, D.C. When asked to check his cellphone to provide a specific time for the above-mentioned call, W-3 appeared to have difficulty providing that information. W-3's cellular telephone was seized pending the issuance of a D.C. Superior Court search warrant to have it process.

12.     In an interview with Witness #4, hereafter referred to as W-4. W-4 stated the decedent always traveled with his cellular telephone and wallet. W-4 provided the decedent's cellular telephone number, (202) 910-7499.

13.     It is your Affiant's belief that there is probable cause that evidence related to this homicide may be contained in the "LG" cellular telephone device. It is also your Affiant's belief that obtaining the phone information requested is the least intrusive means of establishing namely, but not limited to, who possessed or used the device, the subscriber and owner information, the cell phone device phone number, incoming and outgoing calls, contact list, all existing voice mail and text messages, and videos, photographs and tweets contained within the described cellular telephone. Furthermore, it's is your Affiant's belief that this information could establish the whereabouts of W-2 and W-3 cellular telephones on the night and time of the murder and help identify potential witnesses, suspects and confederates yet unknown.

The Device is currently in storage at the Metropolitan Police Department Criminal Investigations Division Homicide Branch in Washington, D.C. In my training and experience, I know that the Device has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into the possession of the MPD.

4

## TECHNICAL TERMS

14.     Based on my training and experience, I use the following technical terms to convey the following meanings:

a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other

5

digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and

6

presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.  IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

g.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

h.  Based on my training, experience, and research, I know that the Device's has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

**ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

15.  Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the Device. This information can sometimes be recovered with forensic tools.

16.  *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct

7

evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

17.    *Nature of examination.* Based on the foregoing, the warrant I am applying for would permit the examination of the Device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

18.    *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

| | |
|---|---|
| _Affiant_ | _United States Attorney_ |
| MPD CID/HOM | |
| Element | |

Subscribed and sworn to me this __25th__ day of __November, 2015__

Curtis E. von Kann

| | |
|---|---|
| Magistrate | Judge |
| United States District Court | Superior Court of the District of Columbia |